## THE REGENTS OF THE UNIVERSITY OF MICHIGAN *vs.* THE BOARD OF EDUCATION OF THE CITY OF DETROIT.

On the 9th of December, 1825, the Governor and Judges of the Territory of Michigan executed to the "Trustees of the University of Michigan, their successors and assigns, to the use of the University of Michigan," a deed of lots 96, 97, and 98, of section 1, of the City of Detroit; said deed purporting to be made pursuant to the Act of Congress, passed April 21, 1806. The first Section of this Act authorized the Governor and Judges of the Territory, among other things, to lay out a town, including the whole of the old town of Detroit, and ten thousand acres adjacent (except a certain Military Reserve), and to grant to those who should establish claims to lots therein, and also to certain persons who were the owners or inhabitants of houses in the old town of Detroit, on the 11th of June, 1805 (when the town was burned), each a lot, where they should think proper. The second Section of the Act provided, that the land remaining of the said ten thousand acres, after satisfying the claims provided for by the preceding Section, should be disposed of by said Governor and Judges at their discretion, and they were authorized to execute deeds, etc.

The second Section of the Act of Congress passed May 26, 1824, confirms to the Corporation of St. Anne's Church, Detroit, a certain portion of said Military Reserve, conveyed to it by the Governor and Judges of the Territory, January 11, 1817. The third Section of the Act provides, that the residue of said reserve, within certain boundaries, shall be vested in the Governor and Judges, "To be disposed of as by the Act of April 21, 1806, is directed."

The Act of Congress, passed May 20, 1826, granted to the Mayor, etc., of Detroit, all claim of the United States to the public grounds in the city, previously occupied for military purposes (reserving certain portions). In August, 1842, an Act, supplementary to the Act of 1806, was passed by Congress, vesting "all the land remaining," except the Court House and Jail, in the Mayor, etc., for certain purposes. These several Acts of Congress constitute the only legislation on the subject. It was *held*, that although Section 2 of the Act of 1806, according to its *literal* terms, authorized the sale and conveyance, only of the land "remaining of the ten thousand acres," yet that, by implication, the power of conveying extended to the whole tract, out of *which the claims were to be satisfied;* that from a review of the several subsequent Acts of Congress referred to, such was the construction Congress had put upon said Act of 1806, and it was held accordingly that the conveyance to the Trustees of the University, although the three lots were not part of the ten thousand acre tract, was valid.

*Held*, also, that the plaintiffs were the legal successors of the Trustees of the University of Michigan.

Case reserved from Wayne Circuit.

This was an action of ejectment, brought by plaintiffs to recover lots 96, 97, and 98, of section 1 of the recorded sections of the City of Detroit, according to the Governor's and Judges' plan of said sections. The plaintiffs claimed title to the premises in question, by virtue of a deed therefor executed by Lewis Cass, then Governor, and Solomon Sibley, and John Hunt, Judges of the late Territory of Michigan, to the Trustees of the University of Michigan, their successors and assigns, to the use of the University of Michigan, bearing date the 9th day of December, A. D. 1825, purporting to be made pursuant to an Act of Congress, passed April 21, 1806. This deed being received in evidence at the trial, and it appearing that the defendants were in possession of the premises demanded, at the time when the suit was commenced, the question whether, upon this state of the facts, the plaintiffs were entitled to recover, was reserved by the Circuit Judge, before whom the trial was had, for the opinion of this Court. Upon the case thus presented, two questions arose : First. Whether the Governor and Judges were authorized by the Act of April 21, 1806, to convey said lots 96, 97, and 98 to said Trustees ; and second, whether the plaintiffs are the successors of the grantees named in the said deed.

*Lockwood & Clarke*, with whom was *J. V. Campbell*, for plaintiffs.

*Howard, Bishop & Holbrook, A. B. Maynard*, and *B. F. H. Witherell*, for defendants.

On the part of the plaintiffs, it was insisted ; first, that the powers exercised by the Governor and Judges was conferred

upon them by the Act of Congress, April 21, 1806 (2 *U. S.
Stat.*, § 1806, *p.* 398): that the Act has been construed for
nearly half a century by the highest legislative and judicial
authority, to confer on the Governor and Judges power to
make such grants as that relied on by the plaintiffs. This
construction was asserted and not deneid, in Scott *vs.* Young
Men's Society (1 *Doug.*, 149). The deed under which the
plaintiffs claim, proceeds from the original source of title, and
cannot be collaterally disputed. (*Jackson* vs. *Lawton*, 10 *J.
R.*, 23; *Same* vs. *Hart*, 12 *Ib.*, 77.) As to the second point,
that plaintiffs are identical with the grantees named in the
deed : plaintiffs' counsel referred to the several Acts of Con-
gress, providing an endowment for a Seminary of learning in
the Territory of Michigan, and relating to the lands set apart
for said Seminary. (2 *U. S. Stat. at Large*, 277 *to* 279; 7 *Ib.*,
*Art.* 16 [*Treaty at Fort Meigs*]; *Shearman's System of Pub-
lic Instruction*, 4; *Const.* 1855, *Art.* 10, *Sec.* 5; *Laws of Mich.*,
1857, *pp.* 102, 105, *Sec.* 16; *Ib.*, 142, *Sec.* 1; *R. S.* 1838, *p.*
223; *R. S.* 1846, *p.* 216; *Art.* 13, *Secs.* 7 *and* 8, *Rev. Const.;
Angel & Ames on Corp.*, 60; *Bac. Ab. Corp.*, 6.) The case
of Bank of Michigan *vs.* Williams (5 *Wend.*, 478), was cited
in support of the power of the Governor and Judges to create
corporations.

For the defendants, it was insisted that the Governor and
Judges had no power to sell lands not within the ten thou-
sand acre tract, and therefore this deed to the Trustees of the
University was void ; that a party claiming by virtue of a deed
from an agent must show not only the agent's authority, but
that he pursued it. (*Nash* vs. *Drew*, 5 *Cush.*, 422; 11 *Metc.*,
470; *Williams* vs. *Peyton*, 4 *Wheat*, 77; *Stead's executors* vs.
*Course*, 4 *Cranch*, 403 ; *Jackson* vs. *Walton*, 7 *Wend.*, 148 ;
*Jackson* vs. *Shepherd*, 7 *Cow.*, 88; 4 *B. Munroe*, 392; *Corbin*
vs. *Jackson*, 14 *Wend.*, 619; *Christie* vs. *Miner*, 4 *Munf.*, 431;
4 *Rand.*, 585; *Waldron* vs. *Tuttle*, 4 *N. H.*, 375; 5 *Pet.*, 319,

45, 56, 47; *Hubbard* vs. *Elmer*, 7 *Wend.*, 446; *Coburn* vs. *Elwood*, 4 *N. H.*, 90; 9 *Pet. C. C. R.*, 607.) A public agent who exceeds his authority, does not bind his principal. (*State* vs. *Muges*, 23 *Miss.*, 516; *Munroe* vs. *Thornton*, 6 *Cranch*, 531; *Story on Agency*, § 307.) A party dealing with an agent is bound to ascertain the extent of his power. (*Brown* vs. *Johnson*, 12 *Smedes & M.*, 398.) It was claimed, therefore, that the title of the land remained in the United States until A. D. 1842, when, by the Act of Congress August 29, 1842, the title vested in the Mayor, etc., of Detroit.

As to the second point : The plaintiffs must satisfy the Court that the Act of 1837 incorporating them, is amendatory of, or supplemental to the Act of 1821, incorporating the Trustees, or that the Act of 1837 was a new charter to an incorporation already in existence. Whether the Act is amendatory of, or supplementary to the Act of 1821, is purely a question of legislative intent, to be decided by the language of the Act itself, without recourse to evidence *aliunde*. (*People* vs. *Oakland Co. Bk.*, 1 *Doug.*, 282 ; 2 *Mason*, 31.) A comparison of the Acts establishes the want of any legal identity between the corporation of the Trustees and that of the Regents. The Act incorporating the latter is perfect and complete in itself, requiring the aid of no other Act to give full effect to all its provisions. (*Wyman* vs. *Hallowwell Bk.*, 14 *Mass.*, 58 ; *Boston Gas Co.* vs. *Langdon*, 24 *Pick.*, 49 ; *Bellows* vs. *Hallowwell and Augusta Bk.*, 2 *Mason*, 31.)

But if the Court should hold that the Act of 1837 was amendatory to the Act of 1821, or was a new charter for the corporation created by said Act, still the title of the premises is not in the plaintiffs. The corporation of 1821 might adopt or reject the new charter of 1837, and it would be wholly inoperative until adopted. (3 *Burr*, 208; *King* vs. *Amery*, 58 *C. L. R.*, 221; *Ellis* vs. *Marshall*, 2 *Mass.*, 269.) There is no proof of the adoption of the Act, which was necessary.

An adoption cannot be presumed. (*Com.* vs. *Cutter*, 13 *Penn. R.*, 133.)

Should it be claimed that the Act of 1837 is subsequent legislation upon the same subject as the Act of 1821, and that the former repealed the latter Act, the answer is, that the repeal of the Act of 1821 effected a dissolution of the corporation thereby created, and the land reverted to the United States. The Legislature cannot regrant the franchises of one corporation to another, while the first is in being. (*King* vs. *Amery*, 5 *E. C. L.*, 221.)

The Legislature cannot forfeit the franchises of a Corporation, but the judgment of a Court only can do so. (16 *Maine*, 221.)

The Act of 1821 created a private, and not a public Corporation. (*People* vs. *Morris*, 13 *Wend.*, 325; *Dart. Col.* vs. *Woodward*, 4 *Wheat.*, 640; *Philips* vs. *Bury*, 2 *T. R.*, 352; 1 *Greenl. R.*, 81; *Allen* vs. *McKean*, 1 *Sum.*, 277; *Angell & A. on Corp.*, 46.) This being so, the title to the land remains in the Trustees, unless their charter is repealed; and if repealed, then the land has reverted to the grantor, the United States, and by the Act of 1842, was conveyed to the Mayor of Detroit.

The counsel also denied the authority of the case of the Bank of Michigan vs. Williams (5 Wend., 478), cited by plaintiffs' counsel: *First.* Because the Bank of Michigan was an institution limited to twenty years. Like the Territorial Government, it was but temporary; its object was to facilitate trade and business. It was not open to the objection urged against the power to create a University, which was without limit as to duration. *Second.* The authority of the case is greatly impaired by the doubts and strong reasoning of the Chancellor in the Court of Errors against the power contended for. *Third.* That decision only touches the question of power in the Governor and Judges to create the

Corporation. It does not touch the question of identity of the two Corporations.

By the Court, GREEN, J.

1. The power of the Governor and Judges to execute the deed in question, is claimed to have been conferred by an Act of Congress, entitled, "An Act to provide for the adjustment of titles of land, in the town of Detroit, and Territory of Michigan, and for other purposes;" approved April 21, 1806.

The first section of this Act authorizes the Governor and Judges of the Territory of Michigan, or any three of them, to lay out a town, including the whole of the old town of Detroit, and ten thousand acres adjacent, excepting such parts as the President of the United States should direct to be reserved for the use of the Military Department, and to hear, examine and finally adjust all claims to lots therein, and also to grant to a certain description of persons, who were the owners or inhabitants of houses in the old town of Detroit on the 11th day of June, 1805, when the same was burned, each a lot where they should think most proper, not exceeding the quantity of five thousand square feet.

The second section provides that the land remaining of the said ten thousand acres, *after satisfying the claims provided for by the preceding section*, shall be disposed of by the Governor and Judges at their discretion, to the best advantage, and they are authorized to make deeds thereof to the purchasers. (*U. S. Stat. at Large, vol.* 6, *p.* 62.) The true construction of this law, in reference to the extent of the powers conferred by it upon the Governor and Judges to sell and convey lands embraced in the old town of Detroit, is not free from difficulty. The first section authorizes deeds to be made to two classes of persons: those who should establish claims to lots therein, and those, or the representa-

tives of those who, not owing or professing allegiance to any foreign power, and being above the age of seventeen years, did, on the 11th day of June, 1805, own or inhabit a house in the same. This latter class of persons had no *claims* to lots in Detroit, and those which were to be conveyed to them in the new town, was a bounty or gratuity bestowed upon them by the Government on account of the losses they had incurred, or the hazards and hardships they had encountered as pioneers in the settlement of a new country, when peril and sacrifice were their constant attendants.

Although the second section, according to its literal terms, authorizes only the sale and conveyance of the land remaining of the *ten thousand acres,* yet, by implication, it is made to embrace also that territory out of which the *claims* provided for in the first section were to be satisfied, and which were claims to lots in the old town. The language is, " the land remaining of the said ten thousand acres, after satisfying the claims provided for in the preceding section."

That this Act was construed by the Governor and Judges as authorizing the sale and conveyance by them of all the lands remaining in the new town of Detroit, excepting such as were reserved for military purposes, after satisfying the claims and appropriations provided for in the first section, appears by the deed which was executed for the benefit of the University ; and it is probable that many conveyances, depending for their validity upon this construction of their powers, were made by the Governor and Judges. This view is strengthened by the Act of Congress of May 26, 1824, entitled, " An Act for the Relief of the Corporation of the Church of St. Anne, and to authorize the extension of Larned street, in the Town of Detroit." The first section of this Act authorizes the Governor and Judges to cause Larned street to be extended westerly, parallel with Jefferson Avenue, until it should intersect the street which runs northerly from said Ave-

nue, near the public barn, and to cause the public barn and the pickets bounding the Military Reserve to be removed to the north side of Larned street. The second section provides, that so much of the Military Reserve lying south of Larned street, thus extended, as is included in the deed from said Governor and Judges to the Corporation of the Catholic Apostolic and Roman Church of St. Anne, of Detroit, on the 11th day of January, 1817, be, and it is thereby declared to be, confirmed to the said Corporation.

The third section provides, that the residue of the said Military Reserve, within certain specified boundaries, should be, and it is thereby declared to be, vested in the said Governor and Judges, to be disposed of as by the Act of April 21st, 1806, is directed. ( *U. S. Stat. at Large, vol.* 6., *p.* 315). From the second section of this Act, it is apparent that the Governor and Judges had made a deed to the Corporation of St. Anne of a parcel of land not embraced in the ten thousand acre tract (so called), including a portion of the Military Reserve, which they had no power to convey under the Act of 1806, and hence this Act confirms to the Corporation so much of the Military Reserve as was embraced in that grant, and thus recognizes the power of the grantors to convey the lands covered by that deed, which was not a portion of the Reserve. This understanding of their powers by Congress is further inferable from the third section of the same Act, which *vests in the Governor and Judges* that portion of the Military Reserve therein described to be disposed of, as by the Act of 1806 is directed. It could not have been supposed that any portion of the land reserved for military purposes was subject in 1824 to any of the claims mentioned in the Act of 1806, and it was, therefore, to be disposed of at the discretion of the Governor and Judges. By the Act of Congress of May 20, 1826, entitled, " An Act granting certain grounds in the City of Detroit to the Mayor,

Recorder, and Aldermen of that city, all the right and claim of the United States in and to the public grounds within the City of Detroit, *heretofore occupied for military purposes*, with certain exceptions therein specified, were granted to, and vested in the Mayor, Recorder, Aldermen and freemen of the city, for the use of said freemen." It does not appear that Congress ever made any other provision for the sale or disposition of land in the City of Detroit, until the 29th of August, 1842, several years after the organization of the State Government, when an Act was passed supplementary to the Act of the 20th of April, 1806, which vested all the land, etc., remaining, except the Court House and Jail, in the Mayor etc., who were constituted a Land Board, in the place of the Governor and Judges, and were authorized to dispose of the same for certain purposes. The lots in question were not land "remaining," within the meaning of the last mentioned Act, and consequently were not vested in the Mayor, etc., by the Act; and we conclude, from this review of the legislation of Congress upon the subject, that the Governor and Judges had power to execute the deed. This power was assumed to have existed, and does not appear to have been questioned, in the case of Scott *vs.* the Detroit Young Men's Society's Lessee. (1 *Doug. Mich. R.*, 119.)

2. Are the plaintiffs the " successors " of the grantees named in the deed?

The consideration of this question requires a somewhat extended examination of the Territorial and State legislation in regard to the University of Michigan. The first Act for the establishment of such an institution, was made and adopted by the Governor and Judges of the Territory, on the 26th of August, 1817, and was entitled, "An Act to establish the Catholepistemiad, or University of Michigan." This law provided for the appointment of a President, and the creation

of thirteen didaxia, or Professorships ; and the President and didactors, or Professors, were invested with power to regulate all the concerns of the institution, and to enact laws for that purpose; to sue, and to be sued; to acquire, hold, and alien property, real, mixed and personal; to make, use, and alter a seal ; to establish Colleges, Academies, Schools, Libraries, Museums, Atheneums, Botanic gardens, Laboratories, and other useful literary and scientific institutions, consonant to the laws of the United States, and of Michigan ; and to appoint officers, instructors, and instructii, in, among and throughout the various counties, cities, towns, townships, and other geographical divisions of Michigan. Their name and style as a corporation, was to be " The Catholepistemiad, or University of Michigan," and the great institution whose affairs were thus confided to the management of this magnificent legal entity, was to bear the same classical name. The didactors, or Professors, were to be appointed and *commissioned* by the Governor, and were to receive from the public Treasury an annual salary, to be from time to time ascertained by law. The funds for supporting the University were to be derived from taxes and other public sources, and the Treasurer was required to keep a separate account of the University fund. (*Shearman's System of Pub. Inst., p. 4.*)

The principal features of this Act, which demand notice as connected with the question involved in this case, are its comprehensiveness as indicated by its style, the broad scope of its objects, and that it was to be supported by a public fund ; all showing that it was intended to be a great public institution, embracing the whole Territory, and such an one as would not admit of the existence of any other, similar in its character and purposes. Whether any organization was ever had of the Corporation thus provided for, does not very distinctly appear, and the Act itself was repealed by a law adopted April 30, 1821, entitled, "An Act for the establish-

ment of a University." See Code of Laws compiled in 1827, page 448.

By this latter Act certain persons therein named were created a body politic and corporate, by the name, style, and title of the "Trustees of the University of Michigan," and as such they, and their successors to be appointed by the Legislature, were made capable of suing and being sued, holding property, real, personal and mixed, and of buying and selling and otherwise lawfully disposing of property.

They were authorized to establish such Colleges, Academies and schools, depending upon the said University, as they might think proper, and as the friends of the Corporation would permit; and to apply such parts of their estate and funds in such a manner as they might think most conducive to the promotion of literature, and the advancement of useful knowledge within the Territory; and to elect a President of the University, who should be, *ex officio*, a member of such Corporation. This institution was to be established in the City of Detroit, and to this Corporation was committed the control and management of the township of land which had been granted to Michigan by Congress, for the use of a Seminary of learning, and the three sections granted to the College of Detroit, by the treaty of Fort Meigs, concluded September 29th, 1817, were vested in the said Trustees, subject to the uses, trusts and purposes for which the same were granted. All the property, rights and credits belonging to the Corporation, established by the Act of the 26th of August, 1817, were vested in the new Corporation, subject to the uses, trusts and purposes for which the same property was granted, given, conveyed or promised.

By Section 9, it is provided that this law or any part thereof may be repealed or modified by the Legislative power, provided that such power of repeal should not extend to divert to any other purpose than those expressed in the grant

thereof to the Corporation, any property granted to them. To this Corporation was the land in question conveyed by the Governor and Judges "to the use of the University of Michigan."

No institution corresponding to the idea of a University, as contemplated by the Acts above mentioned, having been organized, the State Legislature in 1837 passed an Act entitled, "An Act to provide for the organization and government of the University of Michigan." (*Laws of* 1837, *p.* 102.) This Act provided that there should be established in this State an institution under the name and style of "The University of Michigan;" that the objects of the University should be to provide the inhabitants of the State with the means of acquiring a thorough knowledge of the various branches of literature, science and the arts; and that its government should be vested in a Board of Regents, who, with their successors in office, were to constitute a body corporate, with the name and title of the Regents of the University of Michigan. This act, without material modification, was incorporated into and re-enacted in the Revised Statutes of 1838 (*p.* 234, etc.), and also in the Revised Statutes of 1846 (*p.* 216, etc.). Under its provisions "The University of Michigan" was established and went into operation; and the same institution, under the supervision and management of the present Board of Regents, continues to exist, and is successfully accomplishing the great objects of its creation. The new Constitution, after providing for the election of Regents of the University, declares that the Regents thus elected shall constitute the Board of Regents of the University of Michigan, and that they, and their successors in office, shall constitute the body corporate, known by the name and title of "The Regents of the University of Michigan," and as such they have committed to them "the general supervision of the University, and the direction and

control of all expenditures from the University Interest
Fund."

That fund embraces the interest upon all moneys arising
from the sale or disposition of the lands which have been
granted by Congress for the support of a University, College
or Seminary of learning in the Territory or State of Michigan,
or acquired from any other source for the like purpose.

That the Corporation having charge of the University,
since the organization of the Board of Regents, under the
law of 1837, is a public Corporation, created for public
purposes alone, cannot be doubted.

The institution was erected and has been supported by a
public fund, and the Corporators have no private interest
whatever, connected with their corporate character. (*Trus
tees, etc.*, vs. *Winston*, 5 *Stew. & Port.*, 17 ; *Dartmouth Coll.*
vs. *Woodward*, 4 *Wheat. R.*, 629, 660, *et seq.*) But it is
insisted, that " the Trustees of the University of Michigan,"
to whom the land in question was granted, was a private
Corporation, and that their charter constituted a contract
between the Legislature and the Corporators, which the
Legislature could not abrogate without the consent of the
Corporation. To this it may be replied, that the Act of
1821, creating that Corporation, expressly reserves to the
Legislature the power to repeal or modify it. This is a part
of the contract itself, if the Act is to be regarded as a con-
tract, and this, as well as every other provision of the charter,
received the assent of the Corporators when they accepted it.
If not strictly a public Corporation, it partook largely of that
character. The Trustees were to continue in place during
the pleasure of the Legislature only, and all the vacancies
were to be supplied by the Legislature. It did not, therefore,
possess within itself the power of perpetuating its existence.
It might at any time have been dissolved by the removal of
the several Trustees, and the omission by the Legislature to

29

appoint their successors. A large amount of public property was devoted to the support of the institution; but the Trustees were also made capable of holding property, real, personal and mixed: and of buying and selling, or otherwise lawfully disposing of property. Assuming, therefore, that they were a private Corporation in a legal sense, it became necessary to inquire whether their charter was repealed or modified by the Act of 1837, and if so, what was the effect of such repeal or modification, in reference to the property in controversy in this suit. In order to determine this question, we must first consider whether the Legislature of 1837 intended to create another and distinct institution from that contemplated by the Act of 1821, or to organize and put in operation the same. An examination of all the legislation relating to a University in Michigan, leaves no doubt upon this question. In every Act it is styled the "University of Michigan," and its objects are the same in all, though expressed in different language. Each of them appropriated all the public property at the disposal of the Legislature, which had been donated or set apart for the support of such an institution, to its support. Its name imports the existence of but one, and it seems clear that the Legislature had in view the establishment of but one. The Act of 1837, which created a Board of Regents for the government of the University, by its own force removed the then existing Trustees, and substituted in their place other Trustees by the name of "The Regents of the University," as their successors in office.

It is true, that the Act of 1837 makes no express reference to that of 1821, but it legislates upon *the same subject*, and the quotation of the words, "University of Michigan," in its title, is not without some significance, if it were otherwise doubtful, as indicating *what* institution was intended to be organized in pursuance of its provisions.

The fact that the location of the University was fixed by the law of 1821 at Detroit, and that by subsequent legislation it was changed to Ann Arbor, affords no ground of argument against this conclusion. This, and the other changes which were made in the details of its organization, were modifications of the former law of such a character as the Act itself authorized. No injustice is thereby done to the original Corporators, or their successors, for, as we have already seen, they continued in place only during the pleasure of the Legislature, and were severally subject to removal at any time; and upon such removal, any rights or interests which they might have claimed in connection with the Corporation must have terminated. The Corporation was created for the purpose of administering a great public trust, and the present plaintiffs are but Trustees for the same great purpose, and are as truly the lawful successors of the original Corporation as if they had been appointed by the Legislature under the Act of 1821.

The lands in controversy are not diverted from the use declared by the grant, but are still devoted to the same identical purpose. They were conveyed for the use, etc., of "The University of Michigan," and from that use they have not been, and cannot be diverted. The grant must be presumed to have been made with a full knowledge of the power reserved to the Legislature, either to modify or repeal the charter by which the Trustees of the University existed, and it was made in such a manner as to secure the application of the property to the object for which it was granted, without particular regard to the person or persons who should execute the trust.

On the argument of this cause, the counsel for the defendants read a very able and elaborate report from a Committee of the Regents to the board, in March, 1838, in pursuance of a resolution adopted in November, 1837, requiring such Com-

mittee "to take into consideration the legal rights of the
Trustees of the University of Michigan, and how far it is
practicable to alter, by Legislative enactment, the organiza-
tion of that board, so as to constitute the Board of Regents
of the University of Michigan the Trustees of the University
of Michigan. After discussing the various questions supposed
to be involved, this report brings to our notice an important
fact. After showing a non-user of their franchises for a long
period, and deducing certain conclusions therefrom, it states
that, "so satisfied are the Trustees of the old board of the
absolute dissolution of the Corporation, that, by a Committee
of their body, they have placed upon the journal of the Board
of Regents, and the books of the Treasurer of that board,
their surrender of the proceeds of the land mentioned in the
eighth section of their charter; and also yielded up the
control and occupancy of the real estate in the City of Detroit.
This shows that the Trustees practically gave the same con-
struction to the Act of 1837 which we have given to it.
They regarded their own powers as ended, and the Regents of
the University as their successors, and as such, entitled to the
possession and control of all the effects remaining in their
hands for the use of the University. They did not doubt
that the institution which was to be organized under the last
mentioned Act, was the same which was contemplated by
the Act which gave them a corporate existence; and they
seem to have acquiesced, without hesitation, in that legislation
which modified their charter, and provided for the appoint-
ment of their successors; and it is not improbable that this
view of the legislation referred to was finally adopted by
those who were immediately concerned in the question
involved; for we did not learn that any active measures were
ever taken in pursuance of the recommendations of the Com-
mittee, in order to place the Regents in the full and rightful
possession of the corporate property.

But it is claimed on behalf of the defendants, that if the old Corporation has been dissolved by a repeal or modification of its charter, pursuant to the provisions of the ninth section, the lands reverted to the grantors, and were vested in the Mayor, etc., of the City of Detroit, by the supplementary Act of Congress of the 29th of August, 1842. If the views which we have already expressed be correct, and the plaintiffs are the lawful successors of the grantees, they are the persons indicated in the grant as Trustees of the property, and there can be no reversion until the *cestui que trust*, or beneficial object of the grant, shall cease to exist in contemplation of law.

Another point was made by the counsel for the defendants, which we do not now deem it necessary to discuss at length. It is assumed that the Legislative Council of the late Territory of Michigan had no power to create such a Corporation, and that the grant to the Trustees, etc., was void. The decision of this question in the case of the Bank of Michigan *vs.* Williams, 5 Wend. R., 478, and 7 *Ib.*, 539, has been affirmed by this Court, and must be regarded as settled. (*Detroit Young Men's Society's Lessee vs. Scott*, 1 *Doug. Mich. R.*, 119; *Swan vs. Williams*, 2 *Mich. R.*, 427.)

It must be certified to the Circuit Court for the County of Wayne, as the opinion of this Court, that the plaintiffs are entitled to recover the premises in controversy in this suit.

Present and concurring, COPELAND, PRATT, BACON, WING, JOHNSON and MARTIN, J. J.

DOUGLASS, J., dissented.