## The Regents of The University of Michigan v. The Detroit Young Men's Society.

*Pleadings: Execution of contract by agent.*—Where a contract purported to be executed by agents of the respective parties, and it was set forth at length in the declaration, and alleged to be the contract of the parties, the declaration was held sufficient without showing how the agency was constituted.

Where agents executing an instrument on behalf of a corporation sign their own names and affix their own seals, such seals are merely nugatory, and the instrument is to be regarded as a simple contract, and, if otherwise valid, binding on the corporation as such.

*Surplusage.*—When a contract thus executed was declared upon as "sealed by the respective parties," and was then set forth in full in the declaration, it was held that the allegation that it was sealed by the parties should be rejected as surplusage. Any allegation in respect to the description or effect of an instrument thus set forth at length, in a matter which must appear upon its face as set forth, is superflous, and should be treated as surplusage.

REGENTS OF THE UNIVERSITY v. DETROIT YOUNG MEN'S SOCIETY.

*Profert.*—In declaring upon a contract thus executed, it is not necessary to make profert. But if it were a sealed instrument, no further profert or oyer is necessary where it is thus set forth in full.

*Interest: demand.*—Where an action was brought for interest due on a contract a[t] a fixed time without any condition, and it was alleged to be unpaid, it was held that no special demand was necessary, and that the breach of the contract sufficiently appeared.

*Power of corporations to purchase and convey lands.*—A corporation having power to purchase and hold real estate for the purposes of their incorporation, entered into an executory contract of purchase, by which they were to make payment at any time within one hundred years, paying taxes and interest in the mean time; and no right to possession was given until payment was made. Suit being brought for interest upon the contract, and neither the declaration nor the contract showing the purpose of the purchase, it was objected that it could not be for the legitimate use of the incorporation. But it was held that the contract was as consistent with that purpose as any other, and that the Court was bound to infer, until the contrary was alleged or proved, that such was the object of the purchase.

The Regents of the University of Michigan have power to take, hold and convey real estate, for any purpose tending to promote the interests of the University, to increase its funds, or otherwise to further the great public objects for which the corporation was created.

Where suit was brought by the Regents to recover the purchase price of lands sold by them, and the declaration alleged their ownership, but did not show the nature of their title, nor how acquired, and it was demurred to on the ground that the Regents had no power to make a sale of lands without special legislative authority: held, that as it was legally possible for the Regents, in some modes and for some purposes, to be vested with the title to lands with power to convey the same, the judgment on the demurrer must be for the plaintiffs.

*Heard May 22d and 23d. Decided December 5th.*

Error to Wayne Circuit, where plaintiffs in error brought suit in assumpsit, declaring as follows:

Wayne County, ss. " The Regents of the University of Michigan," a body politic and corporate, existing under the laws of Michigan, plaintiffs in this suit, by Levi Bishop, their attorney, complain of the " Detroit ·Young Men's Society," a corporation also existing under the laws of Michigan, defendant in this suit, which has been duly summoned to answer the said plaintiffs, of a plea of trespass on the case, upon promises.

For that heretofore, to wit, on the third day of August, in the year of our Lord eighteen hundred and fifty-eight, the said plaintiffs, then being the owners of the lot and parcel of land hereinafter mentioned, and the said defendant

wishing to purchase the same, the said plaintiffs and defendant entered into their certain contract or obligation, in writing, which said contract in writing the said plaintiffs now bring here into Court, sealed by the several parties and their agents executing the same, and which said contract in writing, with the certificate of acknowledgment thereon, is in the words and figures following, that is to say:

"This contract, made in duplicate, and entered into, this third day of August, in the year of our Lord eighteen hundred and fifty-eight, between the corporation known as 'The Regents of the University of Michigan,' of the first part, and the corporation known as 'The Detroit Young Men's Society,' of the second part, witnesseth, as follows:

The party of the first part does hereby agree to sell to the party of the second part, all their right, title and interest in and to the following lot or parcel of land, that is to say: That certain lot and parcel of land, situated in the city of Detroit, State of Michigan, generally called the "University Lot," situated on the corner of Bates and Larned streets, in said city of Detroit, and being eighty feet, more or less, on Larned street, extending from Bates street westerly to the alley, according to the plan of said city, and extending northerly two hundred and ten feet, more or less, on said Bates street, and containing sixteen thousand eight hundred square feet, more or less. This sale is made upon the following terms and conditions:

*First.* The said Detroit Young Men's Society, party of the second part, does agree to pay for said lot the sum of twenty-one thousand dollars, ($21,000), which is to be paid at any time within one hundred years from the date of this instrument.

*Second.* The said party of the second part does agree to pay, also, to the said party of the first part, interest

on said sum of twenty-one thousand dollars, at the rate of seven per cent. per annum, payable semi-annually, on the whole amount unpaid, and the said interest to commence running on the first day of January, in the year eighteen hundred and sixty.

*Third.* The said party of the second part also agrees to pay all taxes and assessments on said property, of whatever nature and description, ordinary and extraordinary, till the party of the second part shall become the absolute owners of the property as hereinafter specified and provided.

*Fourth.* The said party of the second part does also hereby agree to indemnify and save harmless the said party of the first part, from all claim which the city of Detroit may have against the said party of the first part by reason of any improvements which said city of Detroit may have made on said property, or otherwise arising from said property.

Upon the execution and performance of all the foregoing terms and conditions, by the said party of the second part, the said party of the first part will make, execute and deliver, to the said party of the second part, a deed of all their title to said lot or parcel of land.

It is further agreed, that this instrument shall be binding on the assignees and successors of the said parties respectively.

It is further understood and agreed, that if the party of the second part shall, while this contract continues in force, find it necessary to use the name of the party of the first part for the purposes of litigation against third parties, they shall be at liberty to do so, but always at the expense of the party of the second part, and without costs, charge or expense to the party of first part.

It is further agreed that if the party of the second part shall fail or be in default at any time, in the performance of any of the conditions of this instrument, that then, upon three months notice, the party of the first part

may declare this instrument null and void, and the same shall thereupon become null and void, so far as it binds the party of the first part.

In witness whereof, the party of the first part, by the undersigned Regents of the said University, present at a meeting of the Board of said Regents, held in the city of Detroit, on the day first above written, and the party of the second part, by their committee, duly appointed for this purpose, have mutually signed and sealed this instrument, and delivered the same, the year and day first above written.

*Signed, Sealed and delivered in presence of*
GEO. V. N. LOTHROP,
S. STEVENS.

L. H. PARSONS,          [SEAL.]
LEVI BISHOP,            [SEAL.]
J. EASTMAN JOHNSON,     [SEAL.]
B. L. BAXTER,           [SEAL.]
D. McINTYRE,            [SEAL.]
E. LAKIN BROWN,         [SEAL.]
WM. M. FERRY, JR.,      [SEAL.]

*Regents of the University of Michigan.*

W. M. HEAZLIT,
S. STEVENS.

P. E. DEMILL,           [SEAL.]
H. M. WHITTELSEY,       [SEAL.]
J. S. FARRAND,          [SEAL.]
B. VERNOR,              [SEAL.]
S. D. ELWOOD,           [SEAL.]

*Committee on Real Estate of the Young Men's Society, of Detroit, Michigan.*

STATE OF MICHIGAN,
    COUNTY OF WAYNE:

On this third day of August, eighteen hundred and fifty-eight, before me, Sears Stevens, a notary public in and for said county, personally came the within named Luke H. Parsons, Levi Bishop, J. Eastman Johnson, Benjamin L. Baxter, E. Lakin Brown, Donald McIntyre, and William M.

Ferry, Jr., as Regents of the University of Michigan, and Peter E. DeMill, Henry M. Whittelsey, Jacob S. Farrand, Benjamin Vernor, and S. Dow Elwood, as committee on real estate of the Young Men's Society, of the city of Detroit, Michigan, known to me to be the persons who executed the within contract, and acknowledged the same to me as their free act and deed, as such Regents and as such committee respectively, and for the uses and purposes therein expressed.                    SEARS' STEVENS.

And the said contract in writing, being as aforesaid executed by the parties thereto, was mutually delivered in duplicate between the said parties, plaintiffs and defendant, whereupon the said [defendant became liable to pay to the plaintiffs the said interest money, and then and thereby, for the considerations expressed in said instrument, undertook and faithfully promised to pay to the plaintiffs the said interest money, semi - annually as expressed in said instrument, according to the tenor and effect thereof; yet the said defendant, though often requested so to do, hath not paid said interest money, but hath wholly neglected and refused so to do, leaving due and unpaid at the commencement of this suit, two full years of said interest, for which this action is brought: to the plaintiffs' damage five thousand dollars, and therefore they bring suit, etc.

LEVI BISHOP,
*Plaintiffs' Attorney.*

The defendants demurred to the declaration, assigning the following causes:

*First.* That the instrument set forth at length in said declaration, does not constitute any valid or binding contract upon which either the plaintiffs or defendants are or can be in any way liable.

*Second.* That there is no allegation in such declaration that the persons signing such instrument were the duly constituted agents of the said defendants for any such pur-

# 144 SUPREME COURT OF MICHIGAN.

pose, or were in any manner authorized thereunto by any competent action of the said defendants.

*Third.* That the instrument set forth does not conform to the allegations of such declaration, inasmuch as it is not, and does not purport to have been, ever executed by the said defendants, or by any persons for them, nor that the same was ever sealed by the defendants, or their duly constituted agents. And, in that such instrument is not, and does not purport to have been executed by the plaintiffs, or by any person for them, nor that the same was ever sealed by the said plaintiffs.

*Fourth.* That there is no sufficient allegation of the breach of said instrument by such defendants, nor of any demand of payment thereunder.

*Fifth.* That there is no sufficient profert of said instrument, or allegation of profert.

*Sixth.* That the plaintiffs had no power or authority to enter into such instrument without special legislative action thereunto, and there is no allegation thereof.

*Seventh.* That the defendants had no power or authority to enter into such alleged contract without special legislative authority, and there is no allegation thereof.

The Circuit Court sustained the demurrer, and rendered judgment against the plaintiffs.

*L. Bishop* and *T. M. Cooley* for plaintiffs:

1. A contract for the sale of lands may be by deed or by unsealed writing. To make it valid *as a deed* when executed by an agent, the authority must generally be by deed. But in other cases it is only necessary that the authority be given by writing. And in cases of a corporation, the authority may be conferred by mere resolution.

What was the form of authority in the present case does not appear, nor, in the view we take of the case, is it important, as in any event the instrument is good as a simple contract. The latter need not be signed in the

name of the principal, but it is sufficient if it purport to be the contract of the principal, and be signed by the agent:—8 *Pick.* 56; 1 *Doug, Mich.* 457; 9 *Paige*, 188; 20 *Ill.* 629; 4 *Barb.* 274; 17 *Wend.* 40; 22 *Wend.* 325; 1 *Cow.* 513; 3 *Hill*, 72; 8 *M. & W.* 834; 2 *Gray*, 387; 11 *A. & E.* 589; 22 *Pick.* 158; 3 *Johns.* 226; 6 *S. & R.* 12; 15 *Wend.* 256; 35 *Miss.* 385; 1 *H. & J.* 156.

When therefore the several agents signed their names to this contract, which on its face purported to be the contract of their principals, its execution was complete and ample to bind the principals. Affixing seals to their names did not in any way affect the contract thus completed. For if the seals are to be regarded as the seals of their principals, then, either they attached the seals without authority, in which case the instrument would still remain valid as a simple contract:—5 *Mich.* 133: or they attached them with authority, and then the act would be equally nugatory, because the seals are put to the names of the agents, and not to the names of the principals.

On the other hand, if the seals are to be regarded as those of the agents, the attaching them was still nugatory, because, it not being their contract, it could not be sealed with their seals. It remained, therefore, a simple contract, executed by the agents on behalf of their principals:—19 *Johns.* 65; 7 *Cranch*, 304; 30 *Barb.* 218; 2 *Pick.* 352; 1 *Seld.* 229; 3 *Kern.* 585.

The case would not be materially different if the contract itself failed to show with sufficient distinctness that it was the contract of the principals. For under a proper averment to that effect in the declaration, evidence might be given to establish that fact:—19 *Johns.* 60; 5 *Wheat.* 326; 20 *Ill.* 629; 5 *C. B.* 583; 12 *N. H.* 205; 11 *A. & E.* 589; 22 *Pick.* 158; 2 *Conn.* 680.

But after reading this contract it is impossible to be in doubt as to who is the contracting party.

2. It is claimed by defendants that the declaration

does not sufficiently allege that the contract in question was made by *agents* of the parties duly appointed.

The declaration avers that the *plaintiffs and defendants* entered into the contract. This we apprehend is sufficient. It was not necessary to say a word about the execution being by agents. That was matter of proof on the trial: — 2 *Burr.* 1188.

If, therefore, the Court should be of opinion that the agency of the signers was not distinctly alleged in the declaration, what is said in regard to it might be treated as surplusage, and the declaration would still be sufficient.

3. Giving a copy of the contract is a substitute for profert and oyer if that were necessary, and the allegation of breach of the contract is in the usual form.

4. The Regents as a corporation have power to hold and convey land. It is well settled that corporations aggregate have at common law an incidental right to dispose of their lands, unless specially restrained by their charters. So far as *private* corporations are concerned, this principle will not be questioned; but the Regents being a *public* corporation, it may be claimed they do not possess the same power.

"Independent of positive law *all* corporations have the absolute *jus disponendi* of land and chattels, neither limited as to objects nor circumscribed as to quantity."—2 *Kent,* 281; and see 1 *Ves. & B.* 226, 244; 9 *Sim.* 30, 49; *Kyd on Corp.* 108; 1 *Greenl. Cruise,* 61.

We shall not dispute that public corporations may possess ⌐corporate rights in property of which they could not dispose without legislative authority. They are themselves creatures of legislative authority, and subject to change and destruction at the legislative will. As to any property conferred upon them by the sovereignty, *and which they must hold in order to enable them to discharge their public duties,* t may well be held that they have no power of sale. A sale under such circumstances would be inconsistent

with the purpose for which the corporation was created; and the power could not therefore be implied. A city can not sell its streets, because one of the purposes of its creation is to make and keep them in order, and it cannot fully discharge its public functions without them: — 7 *B. Monr.* 680.

But all public corporations are possessed of some functions in the exercise of which they are regarded as private corporations, and governed by the same rules, and subject to the same liabilities as private persons. A city is a mere instrument of government so far as it exercises powers of general administration, conferred upon it as a part of the governmental power of the State, but is subject to all the rules of a private corporation in the management of its corporate property, and of those powers conferred upon it for the benefit of its corporators: — 3 *Hill*, 539; 3 *N. Y.* 463; 5 *N. Y.* 374; 1 *Ind.* 281; 9 *Mich.* 165.

As to any property, then, which a public corporation is not required to retain in order to enable it to discharge its public functions, the inherent power of sale must be the same as in the case of private corporations.

The case does not show how the Regents became the owners of this land, nor the purposes for which it was conveyed to them. Nor do we regard it as important, so long as it does not appear to be held for a specific corporate purpose inconsistent with the right to sell.

But if there could be any doubt of the right to alien in the case of public corporations generally, there should be none in the case of the University. The policy of all our University laws is not to have the University lands worked, rented, or otherwise used as real estate, but *sold*, and their proceeds appropriated to University purposes. The income of the institution is derived from the interest on the proceeds of sales of lands. Most of the lands are vested in the State as trustee; and as such trustee

the State is required to dispose of them and pay over the interest. If the Regents hold title to any, they hold as trustees also, and the same general policy of the law requires a sale by them, and a like appropriation of proceeds. So far, therefore, from an implied authority to sell being inconsistent with the charter of the Regents, it is in entire harmony with all the laws on the subject.

Certainly it cannot be true that the mere fact of a corporation being public precludes the idea of the power to sell lands. Suppose all the University lands conveyed directly to the Regents instead of the State, can there be the least doubt that the corporation which was to depend upon their proceeds for its income, would have power to sell and convey them, whether expressly conferred or not?

5. Power being expressly conferred upon defendants to purchase and hold real estate, it will be presumed, in the absence of any allegation and proof to the contrary, that the purchase was for legal and proper objects, as specified in the charter:— 3 *Seld.* 466; 3 *Comst.* 470; 19 *N. Y.* 369; 4 *Denio,* 392; 3 *Sandf. Ch.* 339; 2 *Cow.* 664; 3 *Wend.* 94; 4 *Hill,* 444; 9 *Humph.* 731; 24 *Wend.* 587; 16 *Pet.* 492; 4 *Sandf. Ch.* 758. But if otherwise, that is a matter for the Attorney General, in a prosecution to vacate the charter, and not a subject of inquiry in this suit:— *A. & A. on Corp.* § 777; 5 *Flor.* 110.

*S. D. Miller* and *G. V. N. Lothrop* for defendants:

The demurrer was properly sustained:

*First.* The declaration was insufficient. It alleged that the contract was sealed by the parties — the respective corporations. The profert of the instrument shows no such seals.

It alleged a contract made by the parties through agents. The profert shows an instrument executed under their personal seals.

It does not allege any delegation of power or constitution of agency by either party.

So far as the party of the second part in the contract is concerned, the profert of the instrument shows no execution of the instrument, by that party or any agent.

*Second.* The instrument set forth in the declaration did not constitute a contract between the plaintiffs and defendants.

It was not executed by the parties, nor by any persons purporting to act for them.

The parties were corporate bodies; neither their names or seals were attached to the instrument.

It was signed and sealed by individuals as such; and in the act of execution they did not purport to be acting as agents.

There is a general clause, stating that the persons first signing were "Regents of the University of Michigan," and that the others were "Committee on Real Estate of the Young Men's Society of the City of Detroit, Mich.;" this was mere description:—4 *Mass.* 595; 4 *Eng. L. & Eq.* 426; 7 *Mass.* 14; 16 *Mass.* 42; 5 *Pet.* 348; 2 *Hill,* 489; 6 *Johns.* 94.

*Third.* The "Regents of the University" had no power to make the contract.

It is an agreement for the sale of lands, and unless power to convey exists, the contract is invalid. Have they this power?

It must be conceded that this so called corporation has no authority to sell any part of the "University lands" given by act of Congress to the State for the purpose of endowing the University.

Not only is the title to all of that property so vested that it can only be transferred by the agents of the State under special legislative action, but such legislation has been had, in pursuance of a general established system,

that the land officers of the State can alone make any binding contract.

We think it must also be conceded that the Regents can have no power to dispose of or incumber the site of the University buildings, — the forty acres of land; this property was given to the Regents "for the use of the State and for that express purpose."

It is quite apparent from the words of the statute that the State alone could exercise the right of disposition.

It is evident, also, from the history of legislation in reference to the University, under its present management, that the necessity for giving the Board of Regents power to sell any of the real estate belonging to the University has never been contemplated.

The only ground upon which the right can be claimed is this: That as by the decision of the late Supreme Court, in the case of The Regents, &c., v. The Board of Education, &c., (4 Mich. 213,) it was held that the corporation, "The Regents," &c., was the successor of the corporation "The Trustees of the University," &c.; and that as such they were entitled to the property in controversy; that being so vested with title, they have the power to sell, either through express authority or by fair implication.

In order to consider this position, it is expedient to form a correct judgment of the question involved in the case referred to. No point was raised nor was any decision had in respect to the nature and extent of the title claimed by the Regents. So far as the case has any application here, it was merely held that, as the land was vested in the "Trustees," for the use of the University, and as that body had given way to the "Regents," the purpose of the donation should not fail, but should be subserved by declaring the latter body to be the successors of the former.

The great point in controversy was, whether the University or the City of Detroit should be permitted to enjoy the property; and there can be little doubt that

the spirit of the law was well administered in holding that the University had the better claim. Whether the reasoning of the Court was altogether correct or not, there is nothing in the necessary consequences of the decision which should weigh against the defendants' position here. And it may be conceded that the Regents were, by means of that case, vested with title to the property "for the use of the University," just as the "Trustees" were; but not to the same extent.

The Regents have no express authority to convey any land belonging to the University.

The Constitution gave them "the general supervision of the University, and the direction and control of all expenditures from the University Interest Fund." *Art. XIII, sec. 5.*

The character and extent of that supervision is shown by the subsequent legislation. It related to the management of the institution in respect to the appointment of officers and instructors, the regulation of the course of instruction, the admission of students, the conferring of degrees, and other details of internal working: it gave them control of moneys received for tuition, for the purpose of repairing the buildings and the increase of the library.

These provisions were doubtless intended to constitute the Board the supreme officers of the University, as an institution of learning, — vested with authority to control its management as such, — vested also with the incidental power to govern its financial management.

The provision that they should have control of the expenditures from the University Interest Fund negatives any implication of power over the principal of that fund or its accumulations.

They have no implied power to sell the land in question.

What authority will the law confer incidentally upon such a body?

Though the Constitution recognizes them as a corporation, it should not be inferred that they are therefore subject to the same rules and principles with private corporations.

It may be granted that they constitute a *quasi* public corporation, like a county or township. These bodies are deficient in many of the powers incident to the general character of corporations, and possess such only as are essential to the discharge of the duties imposed by express statute: — *A. & A. on Corp. p.* 20; 4 *Mich.* 212; 1 *Kern.* 392; 5 *Seld.* 71.

No duty is imposed upon the Board of Regents by statute which rendered necessary the exercise of the power to sell this property.

Conceding that under the decision in 4th Mich. it was proper for the Board to enter into possession of this property, and perhaps to take the rents and profits, we contend that it was also their duty as State officers—limited trustees for the government of a State institution, and for the administration of such resources as the State might provide — to make representation to the legislative authority of the accession to the general fund, and to ask such specific legislation as might in the legislative wisdom be expedient for the management of this valuable property.

This done, their duty, their responsibility, and their authority would have ceased.

[Counsel then reviewed the past legislation of the State, arguing therefrom that the Regents have no power to sell the land in question.]

*Fourth.* The Young Men's Society had no power to enter into the contract in question.

The act of incorporation cannot be so construed as to enable such an organization to enter into an *executory contract* of this character, extending over a period of *one hundred years:*— *S. L.* 1836, *p.* 165; *S. L.* 1859, *p.* 269.

This was not an acquisition of property within the

meaning and purpose of the statute. The society gained no interest in the land. The instrument constituted a mere *chose in action:* it gave the society no right to the possession of the land.

If a private corporation, created "for the purposes of moral and intellectual improvement," may enter into an agreement to buy an uncertain claim to property at any time within one hundred years, to indemnify the other contracting party against unlimited and unascertained claims, to litigate, in the name of such party, with third persons not named, in reference to subject matters not stated, within any period of time,—if it may do all this under the clause authorizing the acquisition of such property as may be necessary and proper for the objects of the corporation, when at the same time the act creating it restrains its capacity to purchase to such property "only as shall be required for its accommodation in relation to the convenient transaction of its business," — there can scarcely be any limit to its power to contract.

The law contemplates an actual purchase of property — not such a speculating agreement as conveys no title and gives no present right to possession.

It contemplates an early if not immediate occupancy for the purposes of the organization alone: not the granting of a right to gain the occupancy a hundred years hence.

Will the law enforce such a contract of indemnity against such a party?

Will the law recognize the right of two bodies of the character named, to grant and receive power to use to an unlimited extent the name of one of them for the purpose of litigation?

We insist that the contract on the part of the Young Men's Society was beyond the scope of their powers and purposes, and was, in its terms, contrary to the spirit and policy of the law:— *A. & A. on Corp., p.* 232, etc.; 1 *Doug. Mich.* 401.

12 MICH.—K.

CHRISTIANCY J.:

All the questions in this case arise upon the demurrer to the declaration. Several causes of demurrer are assigned; and as the judgment of the Court below, sustaining the demurrer, was general, and it does not appear upon what particular ground the declaration was held insufficient, it will be necessary to notice all the special causes of demurrer assigned, unless the objections which relate to the form of the declaration rather than to the right of action, shall be found to be well taken. If any of these are sustained, no question can properly arise upon those which relate to the cause of action itself, and which would be the same under any form of declaration. We shall therefore first notice those which relate to the form of the declaration, and the manner in which the cause of action is set forth.

The first objection is, in substance, that there is no allegation that the persons purporting to sign the contract for the defendant corporation, were their duly constituted agents for the purpose, or in any manner authorized to do so by any competent action of the defendants.

Upon this point the declaration alleges that the "defendant entered into the contract." The contract is made a part of the declaration, and set forth at large in its words and figures, and it is declared upon its face to be a contract "between the corporation known as 'The Regents of the University of Michigan,' of the first part, and the corporation known as 'The Detroit Young Men's Society, of the second part;" and the contract in all its stipulations, is, in form, that of the respective corporations. The attestation clause is in the following form: "In witness whereof the party of the first part, by the undersigned, Regents of the University, present at a meeting of the Board of said Regents, held in the city of Detroit, on the day first above written, and the party of the second part, by

their committee duly appointed for this purpose, have mutually signed and sealed this instrument, and delivered the same, the day and year first above written." The persons purporting to sign for the defendants do so by affixing their individual names, describing themselves col- lectively as "committee on real estate of the Young Men's Society of the city of Detroit." The declaration states the liability of the defendant upon the contract, and alleges the promise of the defendants in consideration of that liability. We think, therefore, the contract set forth, and the allegations of the declaration, are ample to admit full proof of the authority or agency of the persons purporting to execute on the part of the defendant, in any form in which it was competent for that authority to be given. Had the pleader only purported to set forth the contract by its legal effect, it would not have been necessary to notice the fact that it was executed by agents; it might have been stated as executed by the defendant directly; the agency would be mere matter of proof. If it became necessary to allege the agency because the contract set forth purported to be executed by the agency of the com- mittee, then the contract which is set forth as a part of the declaration, and which asserts the agency, and the allegation of the declaration that it is the contract of the defendants, must be held sufficient to admit the proof of the fact. The particular manner of constituting the agency— if not the agency itself—was matter of proof, not of pleading.

The next objection is, that the instrument set forth does not conform to the allegations of the declaration, inasmuch as it does not purport to have been executed by the plaintiffs, or defendants, or any person for them, nor that the same was sealed by the respective corporations or either of them. It needs but a glance at the attestation clause, and the signatures, to show that so much of the above objection as claims that the instrument set forth does not purport to be executed by the plaintiffs or defend-

ants, or any person for them, is not well founded. But there is more plausible ground for that portion of the objection which relates to the allegation in respect to the seals.

The declaration, before setting out the instrument in its words and figures, does allege that " the said plaintiffs and defendant entered into their certain contract or obligation in writing, which said contract in writing the said plaintiffs now bring here into court, sealed by the several parties and their agents executing the same, and which contract in writing, with the certificate of acknowledgment thereon, is in the words and figures following," [setting it forth].

The attestation clause of the instrument (above cited), might indicate an intention of attaching the seals of the parties — the respective corporations — though it is not in the usual form of the attestation clause where corporate seals are to be affixed. But the actual execution is, on the part of the Regents, by signing their individual names as Regents, and by affixing their separate seal (or scroll) at the end of each respective name; and the committee for the defendant corporation sign their individual names as a committee, with a similar seal at the end of each of their names.

We do not think these seals can be treated as the seals of the respective corporations or either of them. They are but the individual seals of the several persons signing the instrument; and as the contract does not purport to be that of the individuals thus executing, but of the respective corporations, these individual seals are merely nugatory, and can not alter the legal effect of the instrument. It must therefore be treated as an unsealed instrument, or simple contract in writing; and, as such, we think the respective corporations are bound by it, if it is in other respects valid in law:—*Angell & A. on Corp.* §§ 295 *and*

223, and cases there cited; see also (by analogy) Sweetzer v. Mead, 5 Mich. 107.

Had the declaration only attempted to set forth the contract according to its legal effect, without setting forth the whole instrument so as to enable the Court to determine its legal effect, doubtless there must have been a variance in proof, as it would not have supported the allegation in respect to the seals. But when the instrument is set forth in full, the Court are to say what is its legal effect; and any allegation in respect to the description or effect of the instrument, in a matter which must appear upon its face as set forth, is, we think, entirely superfluous, and may and should be rejected as surplusage. And if the instrument, as set forth, should correspond with that offered in evidence, no court could, we think, so far disregard the dictates of common sense as to reject it because it did not correspond with such superfluous allegation.

The legal effect of the contract, as it relates to the present action of assumpsit, so far at least as any question can arise upon demurrer, would be the same whether under seal or not; since the statute, *Comp. L.* § 4550, allows actions of assumpsit to be brought upon contracts under seal "in the same manner, in all respects, as upon contracts without seal."

It is further objected that there is no sufficient profert of the instrument. Being but a simple contract, no profert was necessary. But had it been a sealed instrument, not only is the proper profert made, but oyer is granted and the copy furnished in advance; and any further profert, or oyer (the furnishing of another copy) would be but an idle ceremony.

But it is further urged, as a cause of demurrer, that there is no sufficient allegation of the breach of the contract, nor of demand of payment. The interest being due at a fixed time, and without any condition, and alleged to be unpaid, no special demand was necessary: a request

is alleged in the usual form. The breach of the contract, in the non-payment of the interest, is directly and positively alleged.

The declaration is therefore sufficient in every thing relating to the plaintiffs' cause of action and the defendant's liability, if the instrument declared upon be a valid contract.

But the first, sixth and seventh causes of demurrer relate to the validity of the contract; and it is insisted that neither the plaintiffs nor the defendant had power to enter into the contract without special legislative authority, and that none is shown.

We will first consider the power of the defendant. By the act of incorporation — Laws of 1836, p. 166 — the corporation is authorized to acquire, by gift, devise, purchase or otherwise, and to hold and convey, any real, personal or mixed estate whatsoever, necessary and proper for the objects of this incorporation: Provided the same shall not exceed the sum of twenty-five thousand dollars (which is extended to $200,000 by the act of 1859, Laws of 1859, p. 270). But, by section four, the real estate which the corporation is allowed to purchase is to be "only such as shall be required for its accommodation in relation to the convenient transaction of its business." The object of the incorporation is declared to be "for the purpose of moral and intellectual improvement;" and express power is given to establish and superintend a library. We think it quite clear, therefore, the corporation has the power to acquire, by purchase or otherwise, and to hold real estate for the erection of such buildings as they may see fit, and as their convenience may require, for a library, for lecture rooms and places of meeting. And the power to purchase must include, as a means to an end, the power to enter into a contract for such purchase upon such terms as may be agreed [upon. It is not denied that such would be the result, if it appeared upon

the face of the contract, or were otherwise shown, that such was the object of the purchase. But it is said this purpose does not appear - upon, the contract, and is not alleged: and it is urged that such cannot be its purpose, as the time for acquiring a title is extended over the period of one hundred years, the contract giving no right of possession until the whole price is paid, and requiring the society to pay all taxes in the meantime, indemnifying the Regents against all claim of the city of Detroit for improvements, and giving the right to use the name of the Regents for purposes of litigation.

It is true the contract gives the defendant no right of possession until full payment and conveyance. But, on the other hand, as it was not bound to wait the one hundred years to make payment, but was at liberty to pay and call for a deed the next day after the execution of the contract, we can not say, without any allegation or proof to that effect, that the object of the purchase was not for the legitimate use of the society. The contract is just as consistent with that purpose as any other; and we are therefore bound to infer — until the contrary is alleged or proved — that such was the object of the purchase.

The only remaining question, is, that of the power of the Regents to sell this property. This question might depend upon the mode and purposes of the acquisition, the objects and terms expressed in the instrument by which the title was acquired. And as the Regents have been held to be the successors of the trustees of the University under its old organization—who had an express power of sale vested in them—and the powers and functions of the present organization are different in many other respects, the question might perhaps be affected by the fact when and by which organization the property was acquired. But so far as the question of the power of the Regents to sell may depend upon any of these considerations, it can

not be definitely decided upon the present record, as the time when the title was acquired does not appear, nor the mode or purpose of its acquisition. No *particular* title is set forth, nor was this necessary. The allegation is general, that] the plaintiffs, on the third day of August eighteen hundred and fifty-eight, "being the owners" of the premises, and the defendant wishing to purchase, the said plaintiffs and defendant entered into the contract. This allegation, being mere inducement, was sufficient, and it is broad enough to admit proof of any legal title or ownership under which a right of sale could exist. The particular title would be matter of proof only. The title of the plaintiffs is therefore well pleaded, if they were competent in law to take or hold a title which would enable them to sell. If, therefore, as a legal possibility, there could have been, at the time alleged, such a title in the plaintiffs as would give them the power of sale, the judgment upon the demurrer must be for the plaintiffs, however they might have failed upon the trial to establish such title by proof.

The abstract question, therefore, of the legal possibility of such ownership by the plaintiffs, is the only question upon this branch of the cause which can be decided upon this demurrer. Upon this question I think there can be little room for doubt. This being an action at law, any conveyance, by grant or devise, vesting in them the whole legal title, though it were upon special trusts, would satisfy the allegation of ownership contained in the declaration, if it conferred the power of sale, as well as if no trust had been declared. The power of taking and holding real estate — as well as personal property—is generally laid down as one of the powers incident to every corporation, unless there be an express prohibition, or such power be clearly repugnant to the purposes of its creation,] or forbidden by some positive law: — *A. & A. on Corp.* §§ 110, 111; 2 *Kent*, 224. And the power to convey, except

where its acquisition is for some special purpose, not shown here, and inconsistent with the power of sale, is a correlative of the right to acquire:—*A. & A. on Corp. ut supra.* And see *Ibid.* §§ 187 *to* 192. We have no statute of mortmain which can affect the question. And the power of this corporation to take, hold and convey real estate, for any purpose clearly tending to promote the interest of the University, to increase its funds, or otherwise to further the great public objects for which the corporation was created, can not, I think, admit of a reasonable doubt. The right to take and hold property, such at least as the University grounds and buildings, library and apparatus, and to transmit or continue its ownership by corporate succession, was doubtless one of the main objects of the incorporation in its present form; yet no express power of this kind is to be found in the act of incorporation. And, though it is clear that they can exercise no power over the land granted by Congress to the State for the support of a University, nor over the principal of the University fund, the disposition of both of which the Legislature has placed in other hands, yet if some benevolent individual, desirous of promoting the public interest, should have conveyed this or any other land to these Regents in their corporate capacity, vesting in them the whole legal title, for the express purpose and upon the express trust, that they should sell and convey the land in such manner and on such terms as they should deem best for the interest of the institution, and place the proceeds in the State treasury to the credit of the University fund, or expend them for the increase of the library, or the chemical or philosophical apparatus, I can see no possible ground to doubt their power to take and hold the property, or to accept and execute the trust by a sale of the land for such purpose. See *Vidal v. Girard's Executors,* 2 *How.* 190; *Executors of McDonough v. Mur-*

*dock*, 15 *How.* 367; *Perrin v. Carey* (*McMickin's will*), 24 *How.* 465.

Many other cases might be put in which their power of sale would be equally clear. But it is unnecessary to multiply · instances, since a title like that above supposed would be admissible under the allegation of ownership contained in this declaration.

But it is said we can not presume a trust, as none is mentioned in the contract. It is sufficient to say that, if such trust existed, it was unnecessary to mention it in the contract, or in the declaration. It would be sufficient if the title, when produced in evidence, disclosed a trust which would sustain the power of sale. There is no occasion for any presumption. It is not a question for presumption, but what evidence would be admissible under the allegation; and we are certainly not at liberty to indulge any presumption against the truth of the allegation of ownership, which is broad enough to include such title in trust. What right, on the other hand, have the Court to presume that this is a part of the land conveyed to the State for the use of the University? Or that, though conveyed to the Regents, the conveyance was such as to deprive them of the power of sale, when it may have been so granted as to give them that power? Can we deny them the right to prove their allegation? It is not for the Court, upon demurrer, more than for the opposite party, to deny the truth of the allegation demurred to. The question is not upon its truth, but its sufficiency. Its truth is admitted by the demurrer, unless legally impossible.

It was stated on the argument that the lot mentioned in the contract was conveyed, in the year 1825, by the Governor and Judges of the territory of Michigan, to the "Trustees of the University of Michigan" as organized under the act of 1821, for the use of the University; and we are referred to the decision in *The Regents of the University v. The Board of Education of Detroit*, 4

*Mich.* 214, holding the Regents under the present organization to be the successors of said trustees, or, rather, a continuation of the same corporation. But to enable us to decide upon demurrer the power of the present corporation to sell lands thus conveyed, the fact, date and nature of the conveyance, should appear upon the pleadings. It is not desirable, if it were competent, to decide a case of this magnitude hypothetically, further than we may be compelled to do by the nature of the question. The question of the power of the plaintiffs to convey, under the supposed deed from the Governor and Judges, is in no way necessary to the decision of the cause, and is not involved in it; since, if this were decided against the plaintiffs, the decision upon this demurrer must still be in their favor. It will be time enough to decide this question when it is presented by the pleadings, or upon objections taken to the proof which may be offered.

The judgment of the Court below must be reversed, with costs to the plaintiffs in both Courts. And the defendant must have leave to plead to the declaration.

MARTIN CH. J. concurred.

MANNING J.:

The University of Michigan is a public corporation. The People, in their political capacity, are the corporators. It is a part of the educational system of the State, and is under the control of the Legislature, except so far as it has been placed beyond the reach of that body by the Constitution, and the trust attached to the University fund. In all other respects it is subject to State legislation, and may be moulded from time to time to suit the actual or supposed wants of the public. The corporation of to-day is the corporation known as the University of Michigan, under "An act for the establishment of a University," approved April 30, 1821. *Laws of Michigan,*

1827, *p*. 445. And the corporation under this last mentioned act was the corporation created by the Governor and Judges of the territory of Michigan, on the 26th August, 1817, by an act entitled "An act to establish the Catholepistemiad, or University of Michigan," if an organization in fact ever took place under this last mentioned act. See *Regents of the University of Michigan v. The Board of Education of the City of Detroit*, 4 *Mich.* 213. The present corporation has been made to differ from what it was under the two last mentioned acts by the legislation and Constitution of the State. It was a public corporation originally, and has been throughout. It was created to subserve a great public want—the education of the people. For while freedom is the corner stone of our political fabric, intelligence is the cement that holds its several parts together.

The act of April 30th, 1821, gave to the Trustees of the University the control of both the property and government of the institution. They were declared capable of holding property, real and personal, and of buying and selling and otherwise lawfully disposing of it, with certain restrictions imposed on the disposition of property mentioned in the seventh and eighth sections of the act. Under the State government a different policy was inaugurated. The government of the institution and the control of its property were separated from each other, and no longer trusted to the same hands.

The former was given to the Regents, who took the place of trustees under the territorial organization, while the latter was retained by the State, intrusted by law to the Superintendent of Public Instruction.

This office was created by the Constitution of 1835. And by "An act to provide for the disposition of the University and primary school lands, and for other purposes," approved March 20th, 1837, the Superintendent of Public Instruction was to have the care and disposition of

all lands and other property reserved and granted to the State for purposes of education:— *S. L.* 1837, *p.* 209, § 1. He was to sell the University and school lands, and loan the money, the interest on which was to be paid to the State Treasurer, and by him to be passed to the credit of the University or school fund as the case might be:— §§ 16, 19. He was to submit to the Legislature an annual report, exhibiting the condition of the University and primary school funds; to apply the income of the University fund to the payment of such debts as should accrue from the operation of the law establishing the University; and to prepare annually a table of the amount payable to the University, and also the amount of the aggregate payable to the several counties, and present the same to the Auditor General, who was thereupon to issue his warrant on the Treasurer of the State for the amount payable to the University, and to the several counties:—§ 18. And it was made the duty of the State Treasurer to pay such warrant to the Treasurer of the University, or of the county, as the case might be:—§ 19. And by "An act. to provide for the organization and government of the University of Michigan," passed at the same session, the University was organized. See *Laws of* 1837, *p.* 102. This act does not, in express terms, repeal the act of 1821, and yet as it and the act already mentioned cover the ground covered by the act of 1821, and are inconsistent with the latter act, it must be regarded as repealed by implication. It is not necessary for our present purpose to point out the differences between the two acts, any further than to say, that the act of 1837, unlike the act. of 1821, does not give the Regents power to sell, or otherwise dispose of the property of the University. It. states the object of the University to be, to provide the inhabitants of the State with the means of acquiring a thorough knowledge of the various branches of literature, science and the arts, and vests its government in a Board

of Regents, and declares them a body corporate, with the right of suing and being sued, and prescribes their powers, and makes it their duty, as soon as the State shall provide funds for that purpose, to erect the necessary buildings for the University, on grounds to be designated by the Legislature, and in such manner as shall be prescribed by law. No mention whatever is made of the care and disposition of the property of the institution, for the reason that that had been placed under control of the Superintendent of Public Instruction.

Changes have been made from time to time, but none showing an intention on the part of the Legislature to give to the Board of Regents power to dispose of the property of the institution.

By our present Constitution, "The proceeds from the sales of all lands that have been or hereafter may be granted by the United States to the State, for educational purposes, and the proceeds of all lands or other property given by individuals, or appropriated by the State for like purposes, shall be and remain a perpetual fund, the interest and income of which only is to be expended:"—*Art. XIII*, § 2. And by § 8 of the same article it is provided, "The Board of Regents shall have the general supervision of the University, and the direction and control of all expenditures from the University Interest Fund."

Here is a constitutional provision giving the Regents control of the interest of the University fund, but not of the fund itself. Why this constitutional provision if it was intended the Regents should have the control and disposition of the property of the University, as the trustees had under the act of 1821? If it be said, these lands were deeded to the University, and therefore do not come within the description of lands which the Commissioner of the State Land Office is authorized to sell—that officer, instead of the Superintendent of Public Instruction, now having the sale of the University and school lands—the reply is,

the Legislature can give him the power. It is no reason for giving by implication powers which it is clear the Legislature never intended to give. The property the Board of Regents have contracted to sell amounts to $21,000. What power have they to invest the money? On what security, and to whom, and at what rate of interest is it to be loaned, and who is to collect and account for the interest, and to whom? We can hardly suppose the act would be silent on all these subjects if there was an intention on the part of the Legislature to give the power claimed. And; I can see no reason for dividing the University fund into two parts, and placing one in charge of the State, and the other of the Board of Regents.

I would stop here, but for a suggestion that has been started on which I will say a few words.

It has been suggested whether the land contracted to be sold may not be held by the corporation in trust, with power to sell the same. If we suppose such to be the case, I do not see that it removes the difficulty I have stated — the want of power in the Board of Regents to convey. I do not understand that the functions of a corporation can be enlarged by a deed of trust; that is, that a trust can be made the means of communicating new faculties to a body corporate. The admission of such a principle would enable a corporation, after parturition, to be metamorphosed into quite a different being; so much so as hardly to be recognized, if not seemingly to lose its identity. An insurance company might be changed into a bank, and a bank into an insurance company. When a corporation is made a trustee, the execution of the trust must come within the faculties of the corporation, or the trust must go unexecuted until a competent trustee is appointed. If we are correct in these views, the error in supposing the facts suggested would help the plaintiff, lies in taking it for granted that the power of the corporation to convey is in the Board of Regents instead of the State.

It must be borne in mind that this is a public corpora-- tion, created for governmental purposes; that the People of the State in their political capacity are the corporators; and that in creating the corporation they reserved to themselves, through the Legislature, the power of disposing of the property of the corporation instead of giving it to the Regents.

If it be said the suggestion may be carried a step further, and take it for granted that by the trust deed the power to sell is given to the Board of Regents, and not to the corporation, it does not extricate us from the dilemma. If the trust is to the Regents of the University of Michigan, that being the corporate name, it is to the corporation, and not to the persons composing the Board of Regents, as individuals. If it is to them as individ- uals, they must execute it in their individual capacity, and not in the name of the corporation. The contract is in the name of the corporation. And the power of the corporation to convey, as I have attempted to show, is not in the Board of Regents, but in the corporators, the People in their legislative capacity; in other words, in the State.

For these reasons, without noticing the other questions made on the argument, I think the judgment of the Court below should be affirmed, with costs.

CAMPBELL J. did not sit in this case.

*Judgment reversed.*